[Civ. No. 17573.  Second Dist., Div. Two.  Nov. 16, 1950.]

ELAINE  T.  BARTHORPE,  Respondent,  v.  HARRY  F.
BROWN et al., Appellants.

Hadsell, Sweet, Ingalls & Murman, Frank P. Doherty and
Frank W. Doherty for Appellants.

Morris M. Grupp and Martin Tieburg for Respondent.

WILSON, J.—This is an action to impress a trust on real property and for an accounting by the trustee. Defendants have appealed from a judgment decreeing that (1) plaintiff is the owner of an undivided one-half interest in certain real property in Los Angeles County; (2) she is entitled to 50 per cent of all rents, issues and profits from the property from August 17, 1939, and (3) there is due and owing to plaintiff from defendants the sum of $4,845.19 which amount shall be a lien against defendants' interest in the property.

The action was brought by the widow and heir of John Sherman Barthorpe, who died in Los Angeles on September 21, 1943. The complaint alleges that on or about August 17, 1939, Barthorpe and the defendants entered into an oral agreement whereby they agreed to purchase certain real property in Los Angeles County for the sum of $14,000 cash; the property was to be purchased by Barthorpe and Harry F. Brown for the purpose of leasing it to the Jamison Steel Corporation; Barthorpe and Brown were each to own a 50 per cent undivided interest in the property, title to which should be placed in the name of Olive I. Brown, wife of Harry F. Brown; the purchase price was to be raised by two loans, one to be made from a bank in the sum of $5,000 secured by a deed of trust or mortgage and the other in the sum of $9,000 to be made from the sister of Olive I. Brown; the latter was to have no interest in the property other than that of title holder for the benefit of John Sherman Barthorpe and Harry F. Brown; the property was purchased pursuant to the alleged oral agreement, it was leased to the corporation and all encumbrances for the purchase price have been paid in full from the rents and profits; all expenses of operation, including taxes, have been paid and there is a surplus to be divided between the owners.

The court found the foregoing allegations were true; also that no loan was ever asked for or obtained from the sister of Olive Brown; that at the time of the purchase defendants had on deposit in accounts standing in their names as joint tenants in various banks approximately $9,000; that these funds were from the earnings of defendants during their married life; that $5,000 of the purchase price was obtained by a bank loan for which Olive Brown executed a note and deed of trust and the balance of $9,000 was withdrawn from the joint tenancy accounts by Harry Brown with the full knowledge and consent of Olive Brown.

There is but one question for this court to determine and that is whether there is any substantial evidence to sustain the findings.

The following facts are undisputed: Prior to August 17, 1939, and for more than two years thereafter, John Sherman Barthorpe and Harry F. Brown were stockholders and officers of the Jamison Steel Corporation. The stock of the corporation was owned as follows: Barthorpe, 95 shares of common stock, Brown, 95 shares of common stock, Edgar E. Jamison, 95 shares of common stock and 100 shares of preferred stock, and George W. Delette, 15 shares of common stock. Jamison was president of the corporation; Barthorpe was vice president, acted as general manager and was in charge of the San Francisco office; Brown was secretary, treasurer and manager of the Los Angeles office. The board of directors of the corporation consisted of Jamison, Barthorpe and Brown.

Some time prior to the aforementioned date Barthorpe and Brown decided that the quarters occupied by the corporation were inadequate and that a new location should be selected. Immediately prior to August 17, 1939, Brown reported to Barthorpe that he had found a suitable location; that the owner would not lease the property except upon a month-to-month basis but would sell it for a cash consideration of $14,000. Barthorpe and Brown determined that it would be unwise for the corporation to lease the property on a month-to-month basis but because of its other obligations and commitments the corporation was not in a position to purchase the property. Brown suggested to Barthorpe that they purchase it jointly and lease it to the corporation. Barthorpe informed Brown that he would like to participate in such an arrangement but he was not financially able at that time to purchase or pay for a one-half interest in the property and did not know where to get any money.

Thereafter defendants opened an escrow for the purchase of the property for $14,000. Of this amount $5,000 was borrowed from the bank by Mrs. Brown for which she executed her note secured by a deed of trust. The balance of $9,000 was obtained from the joint tenancy bank accounts of defendants. Title to the property was vested in Olive I. Brown by deed dated August 17, 1939.

In September, 1939, the property was rented on a month-to-month basis to the Jamison Steel Corporation and the property continued to be so rented at the time of trial. Rental for the first year was at the rate of $200 a month, for the next

27 months at $250 a month and thereafter at the rate of $300 a month. Rental arrangements for the warehouse were made by Barthorpe and Brown and each time the rent was raised Barthorpe was consulted and agreed to the raise. Jamison was not consulted and knew nothing about the matter. All rental checks were made payable to Mrs. Brown and were deposited in a separate joint tenancy savings account in the name of defendants. All insurance and taxes on the property were paid out of that account as well as the payments on the bank loan until it was paid in full November 30, 1943. Prior to depositing the rentals Mrs. Brown would deduct each month the sum of $60 which she used for her own purposes and which represented 8 per cent interest on $9,000. All rentals received were reported as income on defendants' state and federal income tax returns; the tax thereon was paid out of their personal bank account and not out of the aforementioned savings account.

Mrs. Brown testified that when Mr. Brown asked her if she would loan money to Barthorpe for the purchase she refused but she told him that if in the future "he has the money come to me and I will see what I will do"; that in insisting that the property be placed in her name she was protecting her husband and herself; that Brown would have put it in Barthorpe's name if she had agreed to it; that she told her husband if they withdrew $9,000 from their accounts it would leave their funds very low and that she would have to borrow $2,000 from her sister; that she did not borrow any money from her sister but her husband did not know she had not done so until after the suit was filed.

Harry F. Brown testified he gathered from Barthorpe's letter telling him he had no money but would like to go in on the purchase that Barthorpe wanted Brown to lend him the money since he had loaned him money before on occasions; that he discussed the matter with Mrs. Brown and she would not consent to loaning Barthorpe any money; that he told Barthorpe either personally or by letter that "we had to raise $9,000 and if he could raise his $4,500 Mrs. Brown was willing that I go in with him and take $4,500 of our money and close the deal . . . but she was not willing to put up $9,000 unless the property was put in her name"; that Barthorpe "said it was O.K. to put the property in her name. In other words, he agreed the property should go in her name then when I told him at any time he could get his share of the money to come to me and we would try to put the deal through; in other

words, we would try to put the property in his name and my name"; that at some time he told Barthorpe Mrs. Brown would have to borrow $2,000 from her sister; that he assumed his wife had borrowed the money but he never mentioned the matter again until after suit was filed; that he did not know what she did with the $2,000 or in what bank account she put it and never asked her if she had repaid her sister.

In addition to the testimony of the defendants there is in evidence certain correspondence between Brown and Barthorpe. On March 16, 1942, Barthorpe wrote Brown a letter the sixth paragraph of which reads as follows: "Regarding your personal note covering the Los Angeles warehouse and taxes you paid, would suggest that you withhold further payment on the bank loan until you have received this money back from the incoming rent. I personally feel Brownie that we should at an early date follow the suggestion that I made sometime ago to you when in Los Angeles. I believe it would save us all a lot of trouble and handle same in a more business like manner."

To this letter Brown replied on March 18, 1942, as follows: "Now regards the 6th paragraph of your letter pertaining to the Income Tax I wrote you about on our warehouse building. I am very much surprised on your comments particular on the business like manner on the way I have been handling it. As you know when you spoke to me when down here I informed you just how Mrs. Brown and myself handled this with her sister to get this loan, that is at the time I contemplated purchasing this building you know I wrote you about it asking you whether you wanted to come in on it as I thought then and still think it was only the fair thing for me to do. You wrote me that you wanted to come in on it but did not have any money for your end of the bargain, so then Mrs. Brown and myself went to her sister and borrowed the money giving her our personal security for as you know she did not know you and should anything of happened to the property such as it falling down from an earthquake or some other reason she had to have some security to fall back on and her not knowing you of course you were out of the question. Also as you know Sherm the woman we were buying the building from wanted all cash and as $5,000 was the most we could get a loan on from the Bank at that time we had to get the money somewhere. So Sherm as I told you when here the above are the facts and the reason I did not want Mrs. Brown to go to her sister about repayment on the loan, however

when I got your letter yesterday I told her last-night that you felt we should get this straightened out and repay the loan and that when she saw her sister to inform her on same. I do not know what you have on your mind as regards my business method of handling this but you probably have some reason . . . I feel Sherm that we should get all these things settled as soon as possible . . . So if you can see your way clear to come down I believe we can settle all these matters in a day . . ."

On March 23, 1942, Barthorpe wrote Brown that the reason he was delaying his trip was that "I am trying to have my auditor do a little research work as to several questions you brought up during my last visit to Los Angeles." On March 24, 1942, Brown replied: "If you can come down next week I believe we can fix everything up as regards warehouse building and etc. as Mrs. Brown informed her sister that we wanted to pay off the loan as you suggested."

On May 25, 1943, Barthorpe wrote Brown asking him to send an itemized statement of the affairs of the Los Angeles warehouse showing "balance due bank & Mrs. Brown and bank balance." To this letter Brown replied, "I can assure you that my records are correct on this and as I stated to you in one of my previous letters to you we will go into this matter further when you make up your mind to come down to L. A. to confer on our other difficulties." On the 28th of the same month Barthorpe wrote: "Re—your note regarding L. A. Warehouse, I personally don't see why my asking for a statement has anything to do with my coming to L. A. There is no doubt in my mind but what your records are correct but I still feel I am entitled to know how those affairs stand."

■ There is the presumption that the holder of the legal title owns the full beneficial interest and the evidence to overcome this presumption and establish that the property is held in trust must be clear and convincing. (*Rench* v. *McMullen*, 82 Cal.App.2d 872, 874 [187 P.2d 111]; *Olson* v. *Olson*, 4 Cal.2d 434, 437-8 [49 P.2d 827].) ■ However, the sufficiency of that evidence is primarily a question for the trial court to determine and if there is any substantial evidence to support its conclusion the determination is not open to review on appeal. (*Stromerson* v. *Averill*, 22 Cal.2d 808, 815 [141 P.2d 732]; *Steiner* v. *Amsel*, 18 Cal.2d 48, 53-54 [112 P.2d 635].)

■ The trial court is not bound to accept testimony, even when unimpeached, against a presumption or contrary reason-

able inferences from other facts in evidence. (*Rench* v. *Mc-Mullen, supra*; *Huth* v. *Katz*, 30 Cal.2d 605, 608 [184 P.2d 521].) As stated in the Huth case (at p. 609): "In passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider their interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence." (See, also, *Hicks* v. *Reis*, 21 Cal.2d 654, 659-60 [134 P.2d 788].)

Not only are there conflicts in the oral testimony of the defendants themselves, but there are unexplainable conflicts between their evidence and the correspondence between Barthorpe and Brown, and defendants were unable satisfactorily to explain certain of their actions.

Mrs. Brown testified at the time her deposition was taken that she personally withdrew the $9,000 from their bank accounts and gave the money to her husband; that she was positive he did not accompany her to the bank. At the trial it was established that the checks were drawn by Brown and that he made the withdrawals. Defendants admit no money was borrowed from Mrs. Brown's sister.

Brown testified he had no reason for writing Barthorpe that he and Mrs. Brown went to her sister and borrowed the money nor any reason for telling him that "since my sister doesn't know you we had to give our personal security." In attempting to explain why he wrote Barthorpe that when he received his (Barthorpe's) letter he told Mrs. Brown that Barthorpe thought they should get the matter straightened out and repay the loan when in fact he had had no such conversation with his wife, his only reason was that he wanted Barthorpe to put up his money. Brown maintained throughout his testimony that he had no reason at all for writing Barthorpe all these untruths, his only purpose being to get Barthorpe to come forward with his share of the money. However, he could give no reason why, if that had been the purpose, he had never asked Barthorpe to put up the money although he knew that by the end of the year 1941 Barthorpe was financially able to contribute one half of the purchase price.

Upon being asked why he was assuring Barthorpe that his records were correct if Barthorpe had no interest in the property, Brown testified he was keeping his records correct "in case the deal ever went through." He further testified he personally told Barthorpe that when he got the money "to

come around and I would go to Mrs. Brown to sell the property *back to us.*"

The only explanation defendants made for having deducted $60 a month interest, which was the equivalent of 8 per cent on $9,000, was Mrs. Brown's testimony that "I took it out because I thought it was my money, the $9,000 was our money, and I figured we could fix it any way we felt right to fix it."

■ When two inferences can reasonably be drawn from the evidence, the decision of the trial court is conclusive. (*Rench* v. *McMullen*, 82 Cal.App.2d 872, 875 [187 P.2d 111] ; *Wright* v. *Delta Properties, Inc.*, 79 Cal.App.2d 470 [180 P.2d 57].) ■ The findings are sustained by these facts: Defendants created and maintained the fiction of a loan from Mrs. Brown's sister; they carried the warehouse account separately from their other accounts; Barthorpe agreed to each increase in the rentals; defendants charged 8 per cent interest on $9,000; funds were allowed to accumulate in the warehouse account after the bank loan was paid in full and at the same time Mrs. Brown continued deducting the 8 per cent interest; the correspondence between Brown and Barthorpe clearly demonstrates that Barthorpe was asserting his interest in the property and that Brown at all times recognized such interest; Brown could give no reason for writing Barthorpe as he did. From these facts and from the correspondence between the parties the court was justified in inferring and finding that Barthorpe and defendants agreed that Barthorpe and Brown would purchase the property; defendants led Barthorpe to believe that $9,000 of the purchase price was borrowed from Mrs. Brown's sister whereas defendants themselves loaned the money to the venture and title was taken in Mrs. Brown's name for security.

The trial court found that defendants were accountable to plaintiff for all income from the property involved and that in accounting for the income they were entitled to credit for such sums as were expended in repayment of the loan secured by the deed of trust and the interest paid thereon, real property taxes, insurance premiums and repayment to defendants of the sum advanced by them in the purchase of the property with interest on the unpaid balance. Defendants assert that the judgment in effect gives plaintiff half the income from the property tax free since no credit was allowed

them in the accounting for any of the state and federal income taxes paid by them on the net income from the property, all of which was included in their personal income tax returns; that inasmuch as this is an equitable action and there was no charge of fraud or bad faith on their part, the court should have allowed them credit for one half the income taxes which they paid.

The trial court had the right to and no doubt did give consideration to the evidence of fraud and misrepresentation on the part of defendants and also to the fact that plaintiff had been required to employ attorneys and pay the expenses of the suit in order to obtain property which rightfully belonged to her. Since the court was without power to reimburse her for such expenditures it was justified in the accounting in allowing to defendants or disallowing such amounts as would result in an equitable settlement between the parties.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied December 6, 1950, and appellants' petition for a hearing by the Supreme Court was denied January 11, 1951. Schauer, J., voted for a hearing.